**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                          **Case No.  3:09cr91-LAC**

**PEDRO BENEVIDES**
_____

**GOVERNMENT'S REPLY TO DEFENDANT'S RESPONSE TO
GOVERNMENT'S APPEAL OF MAGISTRATE JUDGE'S
ORDER OF RELEASE PENDING TRIAL**

COMES NOW the United States of America, by and through the United States

Attorney for the Northern District of Florida and, in reply to the response of the

defendant, Pedro Benevides (hereinafter referred to as the defendant), to the

government's brief in support of its "Motion to Stay and to Appeal the Order" of

Magistrate Judge Karla Spaulding's directing the release of the defendant, shows unto the

Court the following:

The undersigned is tempted to respond to the numerous personal allegations by

counsel for the defendant, to include "disregarding the rule . . . ," "disobedience to

judicial orders . . . ," "disrespectfully" referring to defense counsel's motion (*which is

truly ironic in light of the tone of this response*), but will largely refrain from doing so.

We will briefly respond to the allegation that the undersigned refused to comply with an

order of the court in Orlando, Florida.

By way of background, the undersigned was informed by the attorney representing the government in the hearing in Orlando, Assistant United States Attorney (AUSA) Bishop Ravenal, and Special Agent Keith Humphreys, DEA, Pensacola, in a telephone call that the court had requested that the undersigned appear either in person or on a telephone in open court, to answer questions of the court regarding the investigation in this district, and that the court had further requested that the undersigned immediately produce "the file" regarding the investigation in this district for the court's in camera inspection.  For what it is worth, the undersigned was out of town when this call was received, and did not have immediate access to any file, much less "the file" that was being requested by the court in Orlando.

Secondly, when the undersigned questioned both AUSA Ravenal and Special Agent Humphreys about what the court meant by "the file," neither party was able to give a definitive answer.[1]  Because both AUSA Ravenal and SA Humphreys indicated that the court had only given them approximately fifteen minutes to obtain the decision of the undersigned on these two matters, the undersigned instructed them to say that I would not be accepting the offer to personally attend the hearing in Orlando (by telephone or otherwise, since my personal presence seemed irrelevant to the issues before the court), and that until the court in Orlando could define for the government what was meant by

---

[1]It was the impression of AUSA Ravenal that the court wanted to review at least those documents which the government had prepared to disclose to the attorney of record for the defendant in this district, but he could not be sure if this was all that the court wanted to review. It was the firm opinion of SA Humphreys that the court wanted to review the entire "DEA file," which the undersigned did not possess.

"the file," we did not know what to supply the court, and that it was the position of the government that the information already voluntarily disclosed in connection with the direct testimony of SA Humphreys satisfied Rule 26.2;  without additional information from the court, it was therefore the position of the government that it had already satisfied its discovery obligations for purposes of detention, or words to that effect.

What is not made clear in the response by defendant is that the court *did* further clarify for the government what reports and additional information needed to be disclosed, and the government *immediately* supplied that additional information.

It is the opinion of the undersigned that what was ultimately disclosed exceeded what the government should have reasonably been required to reveal to attorneys who (at least at that point) were making only a limited appearance in an out of district hearing on detention.

Nonetheless, the government *did* disclose the additional information requested by the court.  As a result, and despite numerous threats to do so, the court in Orlando did *not* "strike" the testimony of SA Humphreys, and the government assumes that it did not do so because the court was satisfied that the government's discovery obligations (at least for purposes of the detention hearing) *had* been fully satisfied.

Attached as Exhibit A is a list of all the documents disclosed by the government at this detention hearing, both initially, and as a result of specific requests by the court in Orlando.   Actual copies of what were disclosed will be provided to the court, upon request.

3

The defendant's response next gives a long and detailed summary of defense counsel's characterizations of the multiple witnesses put on by the defendant at the detention hearing, most of whom can be accurately characterized as family members of the defendant, or people financially dependent on the defendant, or people to whom the defendant owes money.

Without addressing the specifics of each of those witnesses, it is not surprising that these individuals would say that the defendant, despite being a multiple convicted felon,[2] despite having two prior probation violations, despite being a foreign national who has resided for years in this country but never sought citizenship in this country, despite the fact that the defendant has multiple foreclosures and the seizures of assets that make his financial connection with this country "tenuous" at best, that these individuals would still believe that the defendant was not a flight risk.

The defendant then characterizes the government's evidence in the case at bar as insufficient, to put it mildly.  Again, that is not a surprising thing for the defendant to say.

---

[2]Counsel likes to refer to these prior felony convictions as "property crimes"; the following is what the defendant was actually convicted of:  during July 1993, the defendant was convicted of **felony grand theft** and **felony fraud (obtaining property with a worthless check)**(*Seminole* County, Florida; Case # E90-000844CFA and Case # E91-002796CFA), and then **two counts of felony check fraud** (stopping payment on a check with intent to defraud)(*Orange* County, Florida; Case # CR91-10513 and Case # CR91-12187); he was then convicted in November 1994 of **Grand Theft: First Degree** (*Orange* County, Florida; Case # CR93-7686); four years later, he was convicted during December 1998, of two separate felony fraud related charges regarding **unlawful acts in connection with motor vehicle odometer readings** (state statute 319.35(5)), and "offenses involving vehicle certificates" (**fraudulent bill of sale**; state statute 319.33(6))(*Seminole* County, Florida; Case # E97-003531CFA).  These are not "property crimes" like vandalism, arson, etc.; these are fraud and theft crimes, or crimes of "moral turpitude," involving the overt use of deceit by the defendant.

Without going into a point by point refutation of defendant's extensive attack on the governments evidence, it does not alter the fact that information provided by two former trusted employees of the defendant, Marvin Wayne Jackson and Kenneth Henderson, consistently implicates the defendant as the financial backer for the shipment of kilo levels of cocaine from the Dominican Republic into the Northern District of Florida for distribution.  Both of these witnesses implicated the defendant immediately upon cooperation with the government.  In addition, their anticipated testimony is strongly corroborated by other witnesses, and multiple additional pieces of evidence, to include, but not limited to, undercover conversations with Henderson in which he directly states that "(Marvin) Jackson and the boss" are pressing Henderson to generate drug proceeds to reimburse the "boss," and that the reason why "Sky View Aviation" airplanes cannot be used to fly cocaine into the United States from the Dominican Republic is because "the guy who owns the planes" (i.e., the defendant) won't allow the planes to be used until he receives more drug proceeds to reimburse the money he had made available to finance the purchase of the cocaine, or words to that effect.[3]

In addition, both Jackson and Henderson indicated that the money that the defendant provided to them for both marijuana distributed in part in this district, and the cocaine coming out of the Dominican Republic, was provided to them in the form of a

---

[3]Unlike the defendant, neither Jackson nor Henderson have any prior criminal history before their convictions in this matter.  Henderson is a former Atlanta Police officer decorated for bravery, and a father with minor children; Jackson is a former Army officer (Major) and pilot.

$50,000 cash transfer (provided over three occasions) and a later $100,000 cash transfer, during a particular time frame, and that all transfers occurred at a hotel owned or controlled by the defendant known as the "Knight's Inn" in Orlando, Florida.  The witnesses provided details about these money transfers, to include that the defendant told them that he had "just withdrawn" these funds from the bank, and that when Jackson and Henderson got the $150,000 (total) from the defendant, that the funds were still wrapped in bank wrappers.[4]

During the same time frame as indicated by these witnesses, the investigation in this district was able to confirm that the defendant had in fact withdrawn $150,000 in cash from a bank in Orlando.  More importantly, this cash withdrawal was virtually unique by the defendant; at no time in the prior ten years (or more) had the defendant ever withdrawn such a large amount of cash, using his name and his social security number, from any bank account.  The bank teller who assisted in supplying these funds to the defendant has told DEA that, when she questioned the defendant about why he was withdrawing such a large amount of cash, the defendant told her the money would be

---

[4]Both Jackson and Henderson identified the source of supply for the marijuana financed by the defendant as Michael Sun.  Mr. Sun was arrested *after* the detention hearing in Orlando, on 10/28/09, on state marijuana charges stemming from this investigation; he immediately cooperated and gave a detailed statement post-*Miranda* that implicated the defendant in the financing of illegal drug activity.  He confirmed, among other things, that he had been present when the defendant provided funds for marijuana to Marvin Jackson, that the defendant knew the money he was supplying to Jackson was to finance the purchase of marijuana being supplied by Sun (via a named source of supply out of New York), that the funds transferred by the defendant to Jackson took place at the "Knights Inn," and that the funds involved a "stack of cash" that "looked like it just came from the bank." This is consistent with the prior information already provided by Jackson and Henderson.

6

used to pay "cash bonuses" to his employees, but both the defendant's book keeper, and tax records, indicated that no such cash bonuses were ever paid by the defendant to his employees, much less after the withdrawal of these funds.[5]

Additional information consistent with that provided by Jackson and Henderson would include the anticipated testimony of Christopher Evans, who has told DEA that during the course of the conspiracy, Henderson repeatedly stated to him that the defendant was the primary or main financial backer for the marijuana and cocaine available to Henderson, and that both the defendant and Jackson were "pressuring" Henderson to reimburse the defendant for the money he (the defendant) had supplied for these drugs, and to pay the defendant his expected profit, or words to that effect.

Officer Martez Lawrence, Pensacola Police Department, who dealt with Henderson in an undercover capacity, will testify that in his conversations with Henderson, it was clear that there was a "boss" beyond Jackson that Henderson needed to reimburse for funds previously supplied by this boss to obtain drugs, and that this "boss"

---

[5]At the time of his arrest, the defendant made a post-*Miranda* statement to SA Humphreys that he had withdrawn "$200,000 in cash on one occasion during 2008" from First Commercial Bank (the same bank from which the $150,000 in cash was withdrawn in 2008), and that he had used the money to pay bills, buy a car, pay employee bonuses, and that he had given "$100,000" of that cash to Daniel Rojo, or words to the effect.  When asked why Daniel Rojo, a multimillionaire, would need a transfer of "$100,000" in cash from the defendant, he responded that Mr. Rojo needed the money because Rojo's accounts, like those of the defendant, had been seized by the government (in an unrelated investigation).  But the withdrawal of the $150,000 by the defendant occurred on *June 20, 2008*, and the seizure of bank accounts connected with Daniel Rojo did not occur until *August 22, 2008*, or over two months later.

was identified to Officer Lawrence as the person that owned the planes for "Skyview Aviation," or words to that effect.

There will be additional evidence and testimony along these same lines which will support the anticipated testimony of Jackson and Henderson; suffice it to say that the government's assessment of the strength of the evidence against the defendant is significantly different from that of counsel for the defendant, and apparently that of the court in Orlando.

But the key issue for purposes of this appeal is whether the defendant is a flight risk, or danger to the community.

At the time of the detention, beyond the nature of the charges themselves, the most compelling evidence available to the government was the recently obtained information from a voluntary cooperating individual, who counsel for the defendant in his response refers to as ". . . this deeply vindictive and sociopathic individual."  What is almost lost in this rhetoric is that this person is yet another trusted employee of the defendant (like Jackson and Henderson), but unlike Jackson and Henderson, this person came forward to law enforcement voluntarily, out of fear for his life and the life of his family, and indicated that the defendant was (a) planning on fleeing the country to avoid arrest on federal criminal charges, (b) that the defendant was also attempting to arrange for the murder of the mother of one of his children, Yolanda Reese, and (c) the kidnaping of a child of Daniel Rojo, a business associate (who is supposedly the source of at least

8

$100 million in funds deposited into accounts under the control of the defendant, for property Mr. Rojo "may buy" from the defendant, but never did).[6]

At the detention hearing, and as mirrored in the defendant's response, the attack on this voluntary cooperating witness was extensive.[7]

It is also factually incorrect, if not outright misleading, on multiple points. But the government was only able to uncover this information *after* the detention hearing.

For example, the defendant indicates that he "formally fired" this individual through his attorney of approximately eight months, Elizabeth Bird, through correspondence that was dated August 12, 2009.

In reality, the witness had stopped working for the defendant by the end of July or early August at the latest, and when he did so, he removed both documents and guns (which the defendant illegally possessed, and that the witness was afraid would be used against him or his family by the defendant) from the offices of the defendant and turned those items over to law enforcement. This individual then began to contact law

---

[6]One of the multiple defense counsel (DC) for the defendant in Orlando "proffered" to the court that he had been in contact with the DC for Mr. Rojo, and this DC (not Mr. Rojo) had indicated that Mr. Rojo was "unconcerned" about this threat. Mr. Rojo is himself the subject of independent federal investigations, so the ability of this district to confirm Mr. Rojo's opinion on this matter is limited. But it is very unlikely that Mr. Rojo is aware of the full scope of the information now available regarding the defendant's plan to have his son kidnaped, and that if he were aware of it, he would remain "unconcerned."

[7]It appears from a review of the criminal history regarding this witness that he was convicted of Petit Larceny on 2/27/92 (Criminal Court, Bronx, New York), the equivalent of Armed Robbery on or about 9/2/92 (Bronx County Superior Court), and two counts of Petit Larceny on 7/8/99 and 12/09/99 respectively (Clifton Park).

enforcement to attempt to cooperate, and this happened at the latest during the first week of August 2009, and *before* the August 6, 2009, date when the defendant "had the power cut off" at the residence where both the cooperating individual, his wife and children resided.

These dates are critical.  It was the defendant, and not the witness, that was engaged in efforts to retaliate, and these efforts began only *after* the witness had already stopped working for the defendant, removed incriminating evidence from the office of the defendant for release to law enforcement (to include illegal firearms), and only after this witness began to contact law enforcement, not *before* these events, as repeatedly suggested by the defendant.

By the time the power to the residence was "cut off" by the defendant to the witnesses residence on August 6, 2009, the witness had already been in contact with federal authorities in Orlando; his first detailed conversation was with Special Agent Dan Moritz, with DEA, Phoenix, AZ, on August 11, 2009; SA Mortiz in turn put this individual in contact with Special Agent Humphreys.[8]  This individual then met with SA Humphreys on August 12 and 13, 2009, and provided information as outlined above.

---

[8]The witness was particularly urgent in his desire to speak with law enforcement on August 11, 2009, because the defendant had called the witness (who was in New York) and told the witness that he (the defendant) was aware "from watching security video" that the witness had removed the defendant's firearms from the defendant's office; the witness then learned that the defendant had confronted this individual's wife and children at their home in Eustis, Florida, and indicated that the defendant wanted their family out of the house immediately, and that "it would be terrible if something happened to somebody in the family," or words to that effect.

The date that the cooperating individual met with SA Humphreys is also significant, because it was not until that date (when he physically met with DEA), or August 12, 2009, that Elizabeth Bird provided correspondence (bearing that same date) documenting that this witness had now been "formally fired" by the defendant.  It is also only after that date (the date the witness physically met with DEA) that he had a "confrontation" on August 19, 2009, at the house where this individual had resided with his family, with no less than *three* representatives of the defendant, and the witness allegedly "threatened" the defendant.  Without belaboring the point, the government contends that an accurate understanding of the timing of these events puts them in a wholly different light than the one conveyed to the court in Orlando.

It was also primarily through Elizabeth Bird that the defendant introduced photographs of the house where the witness and his family had resided, alleging that after the witness had moved out, as demanded by the defendant, this witness had "trashed the house" upon leaving it in "retaliation" against the defendant, and that this was consistent with the witnesses character of being a "lying sociopath," or words to that effect.

Again, the rest of the story paints a different picture.

This individual began the process of moving out of the residence on August 17, 2009; he had resided at this residence for an extended period of time with his wife and young children, and among other things, "moving out" meant moving the appliances inside the house *that belonged to him*, removing some installed speakers inside the house

*that belonged to him*, etc., and this witness was engaged in that process as early as August 17, 2009, as directed by the defendant.

This individual had successfully accomplished some (but not all) of the move by the end of August 17, 2009, and intended to complete it on August 19, 2009.  But when he returned to complete the move on August 19, 2009, he discovered that the house had apparently been broken into, *and* the locks had been changed.  Because of the break in, this individual immediately contacted the Lake County Sheriff's Office and filed a report, indicating that whomever had broken into the home had removed a TV, some computer equipment, the speakers, family pictures, and other items, all of which belonged to the witness.  The undersigned believes that a copy of this report was admitted into evidence in the hearing in Orlando, but if not, a copy will be provided to the Court upon request. These particular items were *not* removed by the witness, as inferred by the defendant, but by someone who had access to this residence *after* August 17, 2009, and then that person (or someone else) had the locks changed.

It is when this cooperating individual returned on August 19, 2009, to complete the removal of his property from the residence, as directed by the defendant, and *after* he was given permission to enter the house by the Lake County Sheriffs Office, that he was confronted by Elizabeth Bird, the defendant's son, and at least two others, and told that he had to "move out."  This individual responded that he was already trying to "move out," but he couldn't complete doing so unless he had access to the structure so he could

12

obtain his property, or words to that effect.[9]  As indicated, it was during this exchange

that the defendant made his "grimy" statement, which Ms. Bird and the others who are

connected with the defendant characterized as "threatening."

The witness finished moving out on August 20, 2009.  In the rush to get out of the

residence, as directed by the defendant, the defendant's stove fell off the back of his

moving truck and was damaged, so he left that particular appliance in the garage of the

residence.  This damaged stove was prominently displayed by the defendant at the

detention hearing, as more evidence of this witness "trashing" the defendant's residence.

Anticipating that the defendant would accuse this witness of something regarding

the "moving out," the witness made a video on his cell phone of the condition of the

house at the time that he left.  That videotape of the condition of the house is inconsistent

with the photos handed up at the detention hearing by representatives of the defendant.[10]

With regard to the "cut in the screen" by the swimming pool, the witness said that was a

---

[9]As indicated above, at the detention hearing the defendant made much of the fact that
this residence had been "trashed" by this witness, in large part because of the alleged removal of
appliances and other items from the residence.  Also as indicated above, most of these items, to
specifically include the refrigerator, dishwasher, etc., *belonged* to this witness.  Since the
detention hearing, the witness has provided the DEA with receipts establishing that these items
were purchased by him.  DEA then confirmed the receipts with the appliance store where the
items were purchased, and also examined the appliances themselves (they are now installed at
the new residence where this witness resides with his wife and children) and confirmed by serial
number that they are the same as those listed on the receipts.  Counsel for the defendant in
Orlando openly accused the witness of stealing this property.  The witness has adamantly denied
this, and as indicated, has provided receipts and documentation establishing that the items
belonged to the witness and his family, not the defendant. (see Exhibit B).

[10]This video will be provided to the Court upon request.

13

pre-existing condition, and one the defendant had known about long before the defendant demanded the witness to move out.

Suffice it to say that the witness strongly refutes the allegations by the defendant that he is a liar, that he came forward only after the defendant "fired him," and that he "trashed" the residence that the defendant demanded the witness to move out of.  He reiterates that he came forward because of his fear of retaliation by the defendant against him or his family, and particularly with regard to the issue of "risk of flight," the witness confirms that the defendant told this witness repeatedly that he (the defendant) intended to flee to Brazil to "avoid arrest by the DEA," or words to that effect.[11]

Since the detention hearing, significant new information has been obtained by the government directly supporting the information provided by this witness, and directly impacting the question of the defendant's risk of flight.

By way of quick background, in the hour and a half "opening statement/proffer" of one of defendant's counsel in Orlando, it was evident that the defendant believed that the witness who was supplying information to law enforcement was *another* (former) trusted employee of the defendant, Larry Frederick.  In reality, SA Humphreys had not had a chance to even speak with Larry Frederick prior to the arrest of the defendant; only *after* the detention hearing was SA Humphreys able to do so.

_____

[11]It is interesting to note that no complaint of theft involving the witness was filed by the defendant regarding the items "removed" from this residence until *September 28, 2009*, which was only *after* the defendant learned that witness was cooperating with law enforcement.

As indicated in the attached affidavit from Special Agent Humphreys (Exhibit B), which the government offers as additional information in support of its request for the detention of the defendant, Larry Frederick (who unlike the defendant, has no prior criminal history whatsoever) indicated that he was a former manager of multiple businesses owned or controlled by the defendant.  Mr. Frederick indicated, among other things, that at least two of the businesses that he ran for the defendant were losing money, and that he now considers the defendant to be a liar, or words to that effect.

Mr. Frederick also conveyed to DEA that he was well acquainted with other employees of the defendant, to specifically include the witness referenced above, and a third employee known as Ivan LeBarca.  Without being told by SA Humphreys what information had been previously provided, Mr. Frederick stated that both the cooperating individual and Ivan LeBarca had come to him on at least two separate occasions (one occasion involving the witness only, and a second occasion involving the witness and Ivan LaBarca) and, seeking his advice, told him that the defendant was asking them to murder Yolanda Reese,[12] and that he wanted one or both of them to kidnap the 10-year-

_____

[12]Since the detention hearing, SA Humphreys has also been able to locate and interview Yolanda Reese.  She confirmed that she *has been* (and is currently) in a custody dispute with the defendant over their son, and contrary to the information conveyed to the court in Orlando by the defendant, that she had specifically *prohibited* the defendant from taking their son to Brazil in 2009 (*as the defendant told her repeatedly that he wanted to do*), and that she had even spoken to the Brazilian consulate on at least three occasions to document that she *did not* give consent for her minor son to be issued a visa so he could be taken by the defendant to Brazil.  See *Exhibit F*.  She also stated that beginning around February 2009 (note: *the defendant's bank accounts were seized in a separate federal investigation on **10/29/08**, and IRS-CID-Orlando conducted a search of the defendant's Orlando residence on **2/10/09***), the defendant told her personally that he intended to move permanently to Brazil with his current family, that he intended to do so

old son of Daniel Rojo.  Mr. Frederick indicated that each time he was told this

information, he urged these individuals not to do these things, and to go to law

enforcement.[13]

On the question of risk of flight, Mr. Frederick indicated that the defendant had

told him *personally* that he (the defendant) intended to flee the country and move his

entire family to Brazil *because he was afraid of being arrested*.[14]

---

immediately, and he offered to move both Yolanda Reese and her fiancé to Brazil as well, and
offered to provide them with up to $1 million if she would not challenge his taking of their son to
Brazil, or words to that effect.  She *did not* accept this offer.  The fiancé, Kenneth Rosenfield,
Esq., was privy to this conversation as well, and will testify.  This information directly
contradicts that provided to the court in Orlando that Yolanda Reese had already consented to
allow the defendant to take their son to Brazil, that the defendant "could take his son to Brazil
any time he wanted to," and therefore he had no motive to have Ms. Reese murdered, or words to
that effect.

[13]The witness independently confirms this advice from Frederick, but indicated that he
and LaBarca chose not to go to law enforcement *at that time* in the hopes that "the defendant
would just forget about it," or "change his mind," and that they believed there would be no
problem as long as neither one of them actually acted on the request of the defendant regarding
the murder or the kidnaping, or words to that effect.

[14]While on this point, the government will briefly respond to the repeated offer of the
defendant to give a "waiver of extradition."  This appears to be an offer that (a) if the defendant
did flee to another country with whom the United States has an extradition treaty, and (b) if the
United States is fortunate enough to track him down in that country, and (c) if the government
could then actually bring the defendant before authorities actually capable of ordering
extradition, the defendant will (d) give us some piece of paper saying he will not oppose that
extradition.  This is like offering to plead guilty to charges that do not even exist yet.  No court
in this country, much less whatever country the defendant would flee to, can be expected to rely
on such a document to support an extradition request, especially one that did not even exist when
the waiver was signed.  It also would not prevent the defendant from fleeing in the first place.
With all due respect, this is posturing by the defendant, and any waiver of this type would not be
worth the paper it was printed on.

16

Mr. Frederick said he was told by the defendant that he wanted to avoid arrest in this country and would rather "fight the charges from Brazil," or words to that effect. Mr. Frederick also went on to tell Special Agent Humphreys (and Special Agent Evans, IRS-CID-Pensacola) that he was one of the individuals that went to Brazil with the cooperating individual, Brittany Benevides, and others.[15]  Contrary to the sworn testimony of Brittany Benevides, Mr. Frederick indicated that the *primary* purpose of the trip to Brazil was to find a residence for the defendant to permanently relocate both himself and his entire family.  Mr. Frederick further indicated that to his knowledge, there were *no* efforts to look for "office space" in Brazil with regard to any "insurance company" in Brazil, as testified to by Brittany Benevides.  He said that the defendant did ask them to look at some "gold and granite mines" while in Brazil "if they had time," but they did not do so because they did not have time, because their focus was to find a residence where the defendant, Brittany Benevides, and their family could permanently relocate to Brazil.[16]

The response of defense counsel to this new information may be predictable.

---

[15]The third and current wife of the defendant, who testified on his behalf at the hearing in Orlando, and whose testimony is quoted at length in the defendant's response.

[16]Mr. Frederick also said the defendant, a convicted felon, was routinely in the possession of firearms.  He identified two of the photographs of guns turned over to law enforcement by the aforementioned witness as the exact type of firearms he had seen possessed by the defendant, one of which was a revolver that was routinely carried by the defendant.  He further said that he had been out to the defendant's residence on at least one occasion to shoot firearms with the defendant, and that the defendant had access to multiple firearms.

17

Even when they mistakenly believed that Larry Frederick was the source of the flight and danger information provided to the government, they characterized him as a liar, a thief, completely unreliable, with a huge motive to falsely implicate the defendant, etc.; defense counsel then moved seamlessly to make the same allegations regarding the cooperating individual, as soon as they learned that it was *not* Larry Frederick.  Larry Frederick and the defendant do appear to be in a civil dispute with one another over some real property (a bank building), an automobile, and like the cooperating individual, the defendant has accused Larry Frederick of "stealing" money from him.  However, there are no criminal charges pending regarding Larry Frederick, and Larry Frederick has no prior criminal history.  Larry Frederick also provides virtually identical information to that of the cooperating individual on the issue of risk of flight and danger to the community, without any prior knowledge of the information provided by that cooperating individual to DEA, and both witnesses are former trusted employees of the defendant (until the defendant learned that they were cooperating with law enforcement).

At some point the continued drum beat of the defendant that employee after employee is a liar, a thief, motivated by revenge, etc., as soon as they begin to cooperate with law enforcement, has to lose its meaning.

Finally, the undersigned again finds it ironic that defense counsel in this response claims that an argument of the government for detention was that the defendant "has too much money."  If anything, the opposite was true.

18

It was not the government, but defense counsel in the hearing in Orlando, that repeatedly touted the wealth of the defendant as a reason for his not having a motivation to flee this country.

As is hopefully clear in the government's brief in support of this appeal, the government believes that the defendant's "wealth" is largely a house of cards, an illusion of assets which the defendant for the most part does not actually own (because, for among other reasons, they are fully encumbered with liens held by others), and as evidenced by the defendant's own witnesses in Orlando (to include Elizabeth Bird) that he has had multiple properties foreclosed on just during the brief time she has known the defendant, within just the past year.

Since the detention hearing, however, the government has obtained additional information which further undermines the defendant's claim that his "great wealth" gives him a reason not to flee this country.  Those would include the fact that the defendant has had  filed against him in March 2009, by the United States a tax lien in excess of $3.6 million (Exhibit C),[17] a $1.8 million judgment by a digital billboard company filed in September 2009 (Exhibit D), and a default judgment in excess of $6 million by

_____

[17]In the hearing in Orlando, and through counsel for the defendant in the response to this appeal, the defendant's residence in Astatula, Florida is offered as security for any bond for the defendant, indicating that this property is "free and clear."  This cannot be accurate.  If this property, or any other property for that matter, is owned directly or indirectly by the defendant in Lake or Orange County, Florida, it is subject to this tax lien.  The residence is located in Lake County, Florida.

Rockbridge Commercial Bank in October 2009, regarding the repossession of one of the defendant's aircraft (the same aircraft used by Jackson and Henderson to transport the $100,000 in currency provided by the defendant to the Dominican Republic for the purchase of cocaine)(Exhibit E).

It is not the government that is arguing that the defendant has "too much money" to flee the country, but the defendant through his counsel; it is the government's position that the defendant's financial empire seems to be largely collapsing, and that this gives him yet another reason to flee, if only to avoid his debtors.[18]

In summary, the decision by the court in Orlando was based on a systematic attack by the defendant on the credibility of the government's witnesses in the case in chief, but especially on the witness providing information on the defendant's (a) plans to flee the country, (b) that the defendant was in possession of firearms illegally,[19] and (c) of the defendant's plans to injure third parties.  The information developed since that

_____

[18]In defendant's response, if we understand his point correctly, he is saying that he may actually have a net worth of only $2.5 million, after deducting all of his other properties which are "fully encumbered or uncollected, and unavailable to the defendant."  That picture is inconsistent with the one that counsel for the defendant in Orlando conveyed to the court, and it also does not appear to take into consideration the above mentioned tax lien or judgments.

[19]These five firearms were turned over to law enforcement by the witness, and are currently the subject of an independent ATF investigation.  The defendant's right to possess a firearm has not been restored.  Four of the five firearms were manufactured outside the State of Florida.  One of those firearms (a .38 caliber nickle-plated revolver) has been either specifically identified or described by three witnesses (the voluntary witness, Larry Frederick, and Marvin Jackson) as exactly the type of firearm that they personally saw the defendant carry or possess on a routine basis in Orlando.

20

detention hearing (and outlined in this reply) bolsters the government's evidence on *all* those points, and particularly the defendant's plans to flee the country to avoid federal prosecution.  It also directly rebuts the reliability of some of the allegations put forth by the defendant at the hearing in Orlando, particularly regarding the defendant's unfettered ability to take his son to Brazil (and that Yolanda Reese had already consented to that travel), that the voluntary witness had approached law enforcement only *after* being "fired and evicted" by the defendant, and then this "deeply vindictive and sociopathic" witness had "trashed" his former residence by removing appliances, etc., in "retaliation" against the defendant.  None of those representations or allegations is accurate, and particularly with regard to having permission to take the child of Yolanda Reese to Brazil "anytime he wanted to," this was something the defendant knew (or should have known) was untrue when saying otherwise to the court in Orlando.

On the question of risk of flight, there are now *three* separate witnesses who have independently told DEA that the defendant told them personally (on or after February 10, 2009, when the defendant clearly *knew* he was the subject of a federal investigation) that he planned to permanently relocate to Brazil (those being the voluntary witness, Larry Frederick, and Yolanda Reese), and two of those witnesses (the voluntary witness, and Larry Frederick) have said the defendant told them personally that he planned to flee *for the specific reason of avoiding arrest,* or words to that effect.

The defendant will say that all these witnesses are unworthy of belief; the evidence overall indicates otherwise.

LEGAL ARGUMENT

The magistrate's order setting conditions of release must be reviewed by a district court.  *United States v. Harrison*, 396 F.3d 1280 (2nd Cir. 2005). The district court review must be done in only the charging district.  *United States v. Torres*, 86 F.3d 1029 (11th Cir. 1996).

With regard to the standard of review, the seven circuits that have addressed it have uniformly held that the district judge should conduct a *de novo* review.

The Eleventh Circuit has provided the clearest directions to the district courts on this subject. *See United States v. Hurtado*, 779 F.2d 1467 (11th Cir. 1985); *United States v. Gaviria*, 828 F.2d 667 (11th Cir. 1987), and *United States v. King*, 849 F. 2d 485 (11th Cir. 1988).  The burden of proof for the government on *risk of flight* is "preponderance of the evidence" (see *United States v. Chimurenga* 760 F. 2d, 400, 405 (2nd Cir. 1985) and *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985), as cited in *United States v. King*, 849 F.2d at 489), and for *danger to the community* the burden is "clear and convincing evidence."  *See* Title 18 U.S.C. Section 3142(f), as cited by *United States v. King*, 849 F.2d at 849.

In summary, a district court in the Eleventh Circuit must conduct an independent, *de novo* review, but can do so without an additional hearing, if after a careful review of

22

the pleadings and the evidence before it, the court finds that it can make a determination

on the question of detention without an additional hearing.  However, if the district judge

concludes that additional evidence is required or that factual issues remain unresolved,

the Court may conduct an additional evidentiary hearing, if necessary. In reaching its

conclusion, the Court must then enter written factual findings and written reasons

supporting its decision. If the Court concludes that pretrial detention is necessary, and

also disagrees with some of the magistrate judge's legal conclusions, or finds that certain

 of the magistrate judge's factual findings were not clearly supported, the court should

specifically so state in writing.

> Respectfully submitted,
>
> THOMAS F. KIRWIN
> United States Attorney
>
> _/s/ Thomas P. Swaim_
> THOMAS P. SWAIM
> Assistant United States Attorney
> Northern District of Florida
> North Carolina Bar No. 10064
> 21 East Garden Street, Suite 400
> Pensacola, Florida 32502-5675
> (850) 444-4000

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to "counsel of record" Kevin J. Darken, Esq., and to "limited counsel of record," Mr. Cohen and Mr. Foster, all of whom are counsel for defendant, this 31st day of October 2009.

/s/ Thomas P. Swaim
THOMAS P. SWAIM
Assistant United States Attorney